THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

EUGENE ISSAC PITTS                                                    PETITIONER

v.                          Case No. 5:15-cv-00354 DPM-JTK

DEXTER PAYNE, *Director*,                                            RESPONDENT
Arkansas Department of Correction

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION INSTRUCTIONS

The following recommended disposition has been sent to Chief United States District Judge D.P. Marshall Jr.  Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the United States District Judge, you must, at the same time that you file your written objections, include a "Statement of Necessity" that sets forth the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.      An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A 149
> Little Rock, AR 72201-3325

## I.  INTRODUCTION

Eugene Pitts, an inmate in the Arkansas Department of Correction (ADC), brings this habeas action pursuant to 28 U.S.C. § 2254, based on newly discovered evidence—namely, the Department of Justice's repudiation of expert witness testimony provided at his trial by FBI Special Agent Michael Malone. Respondent has filed a Motion to Dismiss (Doc. No. 64) asserting Petitioner's Amended Petition does not satisfy the threshold requirements of 28 U.S.C. § 2244 and should be dismissed with prejudice.  Petitioner filed a Response averring he has met the requirements of § 2244 and arguing the Court should address his claims on the merits and grant habeas relief (Doc. No. 67).

Also pending is Petitioner's Motion to Supplement his Habeas Petition and Reply that

the Clerk docketed as a Motion to Amend/Correct Amended Petition for Writ of Habeas

Corpus (Doc. No. 68). In the motion, Petitioner requests the opportunity to supplement both

his Amended Petition and his Reply to include Arkansas Supreme Court case *Williams v.*

*State*, 2020 Ark. 224, 601 S.W.3d 418 (2020), where the court applied the law-of-the-case

doctrine to find itself barred from revisiting its 2017 decision that Williams was precluded

from obtaining writ of error coram nobis relief because he failed to exercise due diligence.

For the reasons that follow, the Court recommends that both the Motion to

Amend/Correct Amended Petition for Writ of Habeas Corpus, Doc. No. 68, and the Motion

to Dismiss, Doc. No. 64, be granted.

A.    **Department of Justice (DOJ) and Federal Bureau of Investigation (FBI) Report**

In April 1997, and in response to a WASHINGTON POST investigation, the DOJ Office

of Inspector General released an official report regarding the investigation of wrongdoing in

the FBI Crime Laboratory.[1] Along with many others, FBI analyst, Special Agent Michael

Malone, was specifically found in that report to have testified falsely, inaccurately, and

outside his expertise. The report scrutinized Malone's examination of a purse that then United

States District Judge Alcee Hastings had introduced as an exhibit in his 1983 trial related to an

alleged bribery scheme. The FBI lab examined the purse in 1985, when an investigating committee

---

[1]See report at https://oig.justice.gov/sites/default/files/legacy/special/9704a/index.htm (last visited November 30, 2020). The report examined allegations of wrongdoing and improper practices within certain sections of the Federal Bureau of Investigation (FBI). The allegations implicated fundamental aspects of law enforcement, including the reliability of the procedures employed by the FBI lab to analyze evidence, the integrity of the persons engaging in that analysis, and the trustworthiness of the testimony by FBI Laboratory examiners.

for the Judicial Council of the Eleventh Circuit Court of Appeals was investigating allegations of misconduct by Hastings in connection with the alleged bribery and other matters. It was determined that Malone falsely testified before the judicial committee that he himself performed certain testing he did not actually perform and also testified outside his expertise and inaccurately concerning those test results.

An April 2012 WASHINGTON POST article revealed that DOJ officials had known for years that flawed forensic testimony might have lead to the convictions of hundreds of potentially innocent people.  Spencer S. Hsu, "*Convicted defendants left uninformed of forensic flaws found by Justice Dept.*," THE WASHINGTON POST, April 16, 2012.  In July 2012, the DOJ commenced a task force to review all federal and state cases between 1982 and 1999 in which FBI laboratory hair examiners testified for the prosecution.  The purpose of this review was "to determine whether any defendants were wrongly convicted or deserve a new trial because of flawed forensic evidence."  Spencer S. Hsu, "*Justice Dept., FBI to Review Use of Forensic Evidence in Thousands of Cases*," THE WASHINGTON POST, July 10, 2012.  Thereafter "[i]n July 2013, the Innocence Project and National Association of Criminal Defense Lawyers (NACDL) announced an agreement with the Justice Department and FBI to review over 2,500 criminal cases involving FBI microscopic hair analysis between 1972 and 1999." Andrew Emett, "*DOJ Admits FBI Forensic Examiners Gave False Testimony for Decades*," NATION OF CHANGE, April 21, 2015. According to THE WASHINGTON POST, the FBI completed reviews of 342 cases.  Out of those cases, 268 trials involved hair evidence used against defendants, and FBI examiners reportedly provided

4

flawed forensic testimony in 257 of those 268 trials, or over ninety-five (95%) of the time. Spenser S. Hsu, "*FBI admits flaws in hair analysis over decades*," THE WASHINGTON POST, April 18, 2015.

In July 2014, the DOJ Office of Inspector General released "An Assessment of the 1996 Department of Justice Task Force Review of the FBI Laboratory."[2]  It was the third report of its kind published since 1997 related to allegations of false or misleading testimony given by the FBI laboratory personnel.  The report devotes an entire chapter—Chapter Four—to Special Agent Malone, who the task force found was a senior examiner for the Hairs and Fibers Unit and handled a disproportionately large number of cases.  The report noted that Agent Malone became well known to many judges and members of the law enforcement community due to his work on several high profile cases, including those of Jeffrey MacDonald, a Green Beret Army surgeon convicted of murdering his wife and children at Fort Bragg, North Carolina; John Hinckley, who attempted to assassinate President Ronald Reagan; and Robert (Bobby) Joe Long, a serial killer in Florida.

The report determined that approximately ninety-six percent (96%) of Agent Malone's cases were problematic in one or more areas.  Some of the most significant, recurring problems with Malone's work were:

1.   His testimony that an individual hair could be determined to belong unequivocally to only one person in the world, based solely on microscopic analysis, had no scientific basis at the time Malone testified.

---

[2] See report at https://oig.justice.gov/reports/2014/e1404.pdf.  *See also* Doc. No. 36-2.

2.      His testimony to the statistical probability of a match was inappropriate in hair analyses based solely on microscopic analysis.

3.      His conclusions, as described in his reports, had unclear and unsupported bases.

4.      His documentation was inadequate and often indecipherable.

5.      His testimony included analysis that was not documented in his lab report or bench notes.

Doc. No. 36-2, pp. 56-57.

**B.      Special Agent Michael Malone testifies at Pitt's trial**

In 1979, a Pulaski County Circuit Court jury convicted Petitioner Eugene Pitts for the murder of North Little Rock veterinarian Dr. Bernard Jones, and the court sentenced him to life imprisonment. Police arrested Pitts on or about January 23, 1979, after they found the body of Dr. Jones on Arlington Drive in his North Little Rock Lakewood-area neighborhood. *Pitts v. State*, 273 Ark. 220, 224, 617 S.W.2d 849, 851 (1981) (Pitts I).

Pitts was no stranger to Benita Terry, who married Dr. Jones following her graduation from the University of Arkansas School of Law (U of A Law School). Pitts and Benita attended the U of A Law School, where they were both among the fifteen to twenty African-American students enrolled there. Because of this small group, Mrs. Jones testified at trial that they would all often commune. *Id.* In fact, because she and Petitioner were from the Little Rock area, they occasionally traveled back to Little Rock from Fayetteville in her vehicle. *Id.* Mrs. Jones was ahead of Petitioner in her studies, and upon graduation, she returned to Little Rock, married Dr. Jones, and began her legal career at Legal Aid.

6

In January 1978, Mrs. Jones started receiving harassing phone calls from Petitioner at Legal Aid.  According to Mrs. Jones, Petitioner's initial conversations were cordial, but he would say she belonged to him and would have to get rid of her husband.  On February 14, 1978, she received a dozen roses from a flower shop with no identification of the sender. *Id*.  On that same day, Dr. Jones received a package at his veterinary clinic that contained a bullet with "Bernard" etched on it. Following delivery of the flowers and the bullet, Dr. and Mrs. Jones went to the prosecuting attorney's office to seek protection.  Thereafter, they obtained an injunction that prohibited Petitioner and the Joneses from harassing one another. *Id.*  Mrs. Jones did see Petitioner in the course of that court proceeding.  The murder occurred on the evening of January 22, 1979.

The facts, as outlined in relevant part on appeal, were as follows:

Dr. Jones left his office at about 5:40, dropped off an employee at about 5:50, and evidently went home. Mrs. Jones got home at about 6:00 and parked her car in the driveway next to her husband's Toyota Land Cruiser. These times are so well established by independent testimony that there is no doubt about their substantial accuracy.

The Jones house, in the Lakewood area of North Little Rock, appeared to be dark when Mrs. Jones got home. As she went in the open front door an intruder with a gun stepped from behind the door, stopped her, and made her go up some steps to a hallway, where the light was on. The intruder wore a beanie cap, pulled down, nothing over his eyes, and some sort of mask that concealed his nose and mouth. Dr. Jones was lying face down in the hallway, with his hands and feet tied and something tied around his head. In the hallway Christmas presents, checks, and other articles were scattered about on the floor.

The intruder refused her request to go to the bathroom and ordered her to lie down. She testified: "By this time I knew who he was and I said, 'It's you, isn't it, Gene?' And he said, 'Don't call me no more Goddamn names and just

shut up and lie down.' " After she lay down Pitts tied her hands and feet, put a scarf in her mouth, gagged her, and tied something over her eyes. She testified that before she was tied up, Pitts said to her husband, "You lied, didn't you, Doc?" The witness continued: "That was when we were walking down the hall. He said: 'You lied, didn't you, Doc? You told me she had a class.' Then I said, 'No, no, he didn't lie. I had a class but I had to come home and get something.' He said, 'Doc, you're going to have to pay for that. You lied.' "

Mrs. Jones testified that after she was bound and blindfolded she could hear Pitts apparently taking things out of the front door. (Later she found that two small TV sets, three watches, a rifle, a shotgun, two cameras, and money were taken. The items were found in the Land Cruiser the next day.) She testified that before Pitts left with her husband, her husband said he could walk and also identified some keys. After the two men left she heard the Toyota Land Cruiser start up. That was 15 or 20 minutes after she got home, which would be about 6:15 or 6:20 p. m.

After Pitts left with her husband Mrs. Jones tried to leave her house, fearing that Pitts would return. Her departure took some time. She got the blindfold down by rubbing her face on the carpet. She also loosened the gag with her tongue. With her hands tied behind her back she was unable to free her feet with a butcher knife on the kitchen floor. She got outside by pushing a little sliding latch with her nose. She "scooted" across the grass to a gate to the neighbors' yard. The lock on the gate didn't work, and someone had removed the string the gate had been tied with. She pushed the gate open and reached the home of her neighbors, who let her in and untied her hands and feet. The neighbors testified that Mrs. Jones's hands were tied behind her back, her feet were tied, and she was partly gagged when she got to their house.

Mrs. Jones called the police, who recorded the time as 6:53. The police tape of the call shows that she said Gene Pitts had tied up her and her husband and had left with her husband in a Toyota Land Cruiser. Officer Montgomery arrived within a few minutes. There was evidence that the intruder had entered the Jones house through a kitchen window and had ransacked the house. Pitts's fingerprints were not found in the house; Mrs. Jones testified he was wearing gloves. She was positive in her identification of Pitts as the intruder.

Pitts was picked up at about 9:30 p.m. After having been warned of his rights he said that he had been trying to collect rent for his employer. The police asked for some addresses so they could interview the people, but Pitts said there had been so many that he didn't know any specific address. He did not

testify at the trial.

The next morning the Land Cruiser was reported to the police as being parked on Arlington Drive, also in the Lakewood area. Dr. Jones's body was in a sitting position on the passenger side. He had been shot once in the side of the head and three times in the back of the head. His body was still tied up.

*Pitts v. State*, 273 Ark. 220, 222–24, 617 S.W.2d 849, 850–51 (1981) (Pitts I).

Following the murder, a search of Petitioner's home produced a paid receipt from a flower shop for a dozen roses to be sent to Benita Terry at Legal Aid. Police charged Pitts with the capital felony murder of Dr. Jones, committed in the course of kidnaping; some six months later, a Pulaski County jury convicted Pitts. At trial, a handwriting expert testified it was highly probable Pitts wrote the address on the package delivered to Dr. Jones that contained the bullet. Also, FBI Special Agent Malone was qualified as an expert and testified at Pitts's trial. Agent Malone testified, in relevant part, as follows:

| | |
|---|---|
| PROSECUTOR: | Agent Malone, I show you State's Exhibit 14 which is a plastic container with hair samples and ask you have you seen that before? |
| MALONE: | Yes, I have. |
| PROSECUTOR: | Would you identify for the jury what that is? |
| MALONE: | This item is a plastic envelope which I received and which contained hairs which were submitted to me as being from Mr. Pitts. |
| PROSECUTOR: | Mr. Malone, this bag of assorted clothing has been previously introduced into evidence as State's Exhibit 1. I'm going to show you three of the articles and ask you if you have had occasion to come in contact with those before? |
| MALONE: | Yes, I have. |

9

| PROSECUTOR: | What was the nature of your contact with those articles? |
| MALONE: | Well, I received these items and they were submitted to me as being from the floorboard of the Toyota. From the FBI office in Little Rock. |
| PROSECUTOR: | Did you perform any examination of those articles? |
| MALONE: | Yes, I did. |
| PROSECUTOR: | And did you find anything foreign to those articles? |
| MALONE: | Yes, I did. |
| PROSECUTOR: | Would you please tell us what that was and where you found it? |
| MALONE: | Basically, what I did was I processed all of these items these three pair of pants for hairs and fibers. I then removed any hairs that I found on these items and placed these hairs on a glass microscope slide. . . . |

(Tr. 1487-1488)[3]

| PROSECUTOR: | Okay. Thank you, Mr. Malone. Did you have occasion to conduct your examination of the slide evidence you have compared against the known defendant's hair? |
| MALONE: | Yes, I did. |
| PROSECUTOR: | Did you find any similarities in any of the suspect hair? |
| MALONE: | Yes. Numerous. |
| PROSECUTOR: | Okay. If you would, please, did you find a hair with the same characteristics or with characteristics of the suspects own hair? |
| MALONE: | Yes, I did. |
| PROSECUTOR: | Is that one of your slides that you have there? |
| MALONE: | Yes, that's correct. |
| PROSECUTOR: | What were the results of your findings in that |

---

[3]The testimony outlined herein is found in the three (3) volume trial record identified in Docket Entry No. 32 as Exhibit 1. A portion of the testimony herein is also found in Docket Entry No. 66.

comparison?

MALONE: Okay. To begin with when we compare questioned hair, a questioned hair is a hair we don't know the source of to a known source we can come up with one of three conclusions. Number one, the questioned hair is a [sic] different from the known hair. In other words, that hair did not originate from that person. Two, there are rare instances where the hair is too damaged or too limited to or for some other reason we can't say it did, we can't say it didn't. And, this is called a no conclusion. Now, finally, each individual microscopic characteristic that I was talking about to match, in other words, all the characteristics of the questioned hair and match all the characteristics of the known hair we then say the hairs microscopically matched and the questioned hair could have originated from a certain individual.

PROSECUTOR: What was your conclusion in this case?

MALONE: I found a dark brown hair of negroid origin on one of the pants reported as being from the Toyota which microscopically matched the head hairs of Mr. Pits in which it could have originated from Mr. Pitts. . . .

(Tr. 1495 - 1497)

PROSECUTOR: Okay. You said that in your conclusion it could have originated from the head of the defendant. Would you please explain that?

MALONE: Okay. To begin with, I don't want to mislead anyone. A hair is not like a fingerprint. In other words, I can't say that the hair from those pants came from Mr. Pitts to the exclusion of everyone else. However, for that hair to have come from anybody else but Mr. Pitts it's definitely going to have to have certain qualifications. Number one, the hair on the pants could have come from no one but a negroid individual. Now, that excludes all [C]aucasians, Mongoloids and people of mixed races. Two, that person if he does exist each individual microscopic characteristic of his hair would have had to

match Mr. Pitts hairs exactly.  All twenty.  There could be no dissimilarities.  Three, if that individual whose hairs matched Mr. Pitts does exist he would have had to be in a position where his hairs would have been deposited on these pants.  However, in my experience as a hair examiner and over the years I examined thousands and thousands of hairs the only way I have seen hairs matched the way the one from the pants matched Mr. Pitts hair is when in fact it did come from the same man.

(Tr. 1499-1500)

On cross examination, defense counsel questioned Agent Malone as follows:

| | |
|---|---|
| DEFENSE COUNSEL: | Have you got your report with you? |
| MALONE: | Yes, I do. |
| DEFENSE COUNSEL: | Would you please turn to page four? |
| MALONE: | I sent two reports. |
| DEFENSE COUNSEL: | Well, I think we've only been furnished with one.  I'll show it to you.  Page four, second paragraph.  Would you favor us in letting us see your second report? |
| MALONE: | Well, I have one dated March 13th and one dated May 25th. |
| DEFENSE COUNSEL: | Let me see your May report.  While I'm looking at it, would you read paragraph 2, page 4? |
| MALONE: | Paragraph 2, page 4 says, that it is pointed out that, "It is pointed out that hair comparisons do not constitute a basis for positive personal identification." |
| DEFENSE COUNSEL: | Read that again good and loud for us? |
| MALONE: | (READING) "It is pointed out that hair comparisons do not constitute a basis for positive personal identification." |
| DEFENSE COUNSEL: | Hair comparisons do not constitute a basis for what? |

12

MALONE:                          For positive personal identification.

DEFENSE COUNSEL:          All right.  That is it can't be used to positively
                                 identify someone?

MALONE:                          That's correct. ...

(Tr. 1500-1501)


DEFENSE COUNSEL:          Would you agree with this statement even though
                                 you don't know who they [B.D. Gowdy and
                                 Gradwohl's Legal Medicine] are?  "There is
                                 considerable disagreement as to the value of hair
                                 evidence.  In general a disparaging view of hair
                                 examination has been taken."  In Gradwall [sic]
                                 there is nothing about hair comparable to the
                                 specificity of fingerprints and at best the
                                 probability of establishing identification from
                                 hairs is perhaps no greater than the probability of
                                 determining identification by using ABO blood
                                 group system and blood smears?

MALONE:                          I'd like to see the article, please?

DEFENSE COUNSEL:          I'm asking do you agree with that statement?

MALONE:                          Well, I would have to read the article.

DEFENSE COUNSEL:          You can read the article.  You should have done
                                 that before you came to Court, I think.  But, if you
                                 haven't read the article and you are not familiar
                                 with it just say you're not?

MALONE:                          No, I am not familiar with the article.

DEFENSE COUNSEL:          Do you agree with the statement?

MALONE:                          No, I do not.

DEFENSE COUNSEL:          All right.  That's all you have to say.  Now, you
                                 have told us though that is not and cannot be used
                                 as a basis of personal identification?

MALONE:                          That's correct.

                                 . . .


(Tr. 1503-1504)

13

| | |
|---|---|
| DEFENSE COUNSEL: | All right.  And, you came here to tell us that on Doctor Jones clothing you found hairs that number one, you decided belonged to a black man? |
| MALONE: | That's correct. |
| DEFENSE COUNSEL: | All right.  How many hairs? |
| MALONE: | One. |
| DEFENSE COUNSEL: | One single hair from a black man for a black person.  Now, you said you could determine the sex as a male? |
| MALONE: | No, I did not say that. |
| DEFENSE COUNSEL: | You can't determine sex? |
| MALONE: | That's correct. |
| DEFENSE COUNSEL: | You can not? |
| MALONE: | That's correct. |
| DEFENSE COUNSEL: | Then it could have been a black woman? |
| MALONE: | It was from a black individual. |
| DEFENSE COUNSEL: | It is not generally recognized that the sex and did you not tell these people earlier that you can determine sex from the examination of the hair? |
| MALONE: | I did not say that.  No. |
| DEFENSE COUNSEL: | That is relatively a - - I don't want to say a new field, but it's a striving field.  Some of you people feel that you can so far as determining the sex of the person from the hair, do they not? |
| MALONE: | Most experts do not believe you can determine the sex from the hair. |
| DEFENSE COUNSEL: | But you can tell, for example, if a person is oriental, caucasion [sic], negroid, in determining race? |
| MALONE: | You can determine race.  Definitely. |
| DEFENSE COUNSEL: | That's a big help to us.    So, at this point this establishes that at one time or another Doctor |

|                  |                                                                                                                                                                                                                                                                                                  |
|------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                  | Jones had been around a black person, a person of his own race.  And from which he got one hair.  Incidentally, did you find any caucasian hairs?                                                                                                                                                  |
| MALONE:          | Yes, I did.                                                                                                                                                                                                                                                                                       |
| DEFENSE COUNSEL: | How many caucasian hairs?                                                                                                                                                                                                                                                                         |
| MALONE:          | Numerous.                                                                                                                                                                                                                                                                                         |
| DEFENSE COUNSEL: | How many?                                                                                                                                                                                                                                                                                         |
| MALONE:          | Numerous.                                                                                                                                                                                                                                                                                         |
| DEFENSE COUNSEL: | Count them and tell us?                                                                                                                                                                                                                                                                           |
| MALONE:          | With respect to hairs if we find more than a dozen we do not count them.  We call them numerous.  Sometimes in dealing with thousands of hairs it would be impossible to count them all.                                                                                                           |
| DEFENSE COUNSEL: | All right.  Did you find thousands of caucasians [sic] hairs on his clothes?                                                                                                                                                                                                                      |
| MALONE:          | I found numerous hairs.                                                                                                                                                                                                                                                                           |
| DEFENSE COUNSEL: | Well, would it be more?  Can you estimate the dozens of hairs of caucasian hairs?                                                                                                                                                                                                                 |
| MALONE:          | As I said, I didn't count them.  So, I couldn't - -                                                                                                                                                                                                                                               |
| DEFENSE COUNSEL: | Sir, let me ask you this.  Isn't it true that to say whether or not all these numerous hairs if it was hundreds or thousands that you say were caucasians you would have to examine them in order to say that they didn't belong to this suspect or some other suspect, wouldn't you?  Or that they weren't negroid or they weren't caucasian? |
| MALONE:          | Yeah.  I did examine the hairs.                                                                                                                                                                                                                                                                   |
| DEFENSE COUNSEL: | All right.  Look at your notes and tell us how many you examined?                                                                                                                                                                                                                                 |
| MALONE:          | Numerous.                                                                                                                                                                                                                                                                                         |
| DEFENSE COUNSEL: | You don't mind looking at your notes, do you?                                                                                                                                                                                                                                                     |
| MALONE:          | No.                                                                                                                                                                                                                                                                                               |
| DEFENSE COUNSEL: | All right.  Why don't you do that for us.                                                                                                                                                                                                                                                         |
| MALONE:          | I found numerous hairs.                                                                                                                                                                                                                                                                           |

15

| | |
|---|---|
| DEFENSE COUNSEL: | Thank you.  That were caucasian? |
| MALONE: | That were caucasian. That's correct. |
| DEFENSE COUNSEL: | All right.  And, you're not trying to say or leave the inference and maybe you are and that's what I'm trying to clear up.  Whoever the owners of those hairs were you don't know.  Black, white, yellow or green, what part they contributed if any in the death of Doctor Jones, do you? |
| MALONE: | I know the race of the individuals.  I don't know what part - - |
| DEFENSE COUNSEL: | (Interposing) You don't know what part if any they played in his death? |
| MALONE: | That's correct. |
| DEFENSE COUNSEL: | From the one black hair from the one black person man or woman.  Isn't that true?  We're not - - |
| MALONE: | (Interposing) I don't understand your question. |
| DEFENSE COUNSEL: | You didn't have that much difficulty.  I don't believe, understanding [the prosecutor].  But we'll go on and do the best we can.  Isn't it true that according to most authorities the investigation can only determine the possibility that this person may have owned that hair at one time or another? |
| MALONE: | That's correct.  Based on his experience he can determine a general probability - - |
| DEFENSE COUNSEL: | (Interposing) And his overall willingness to be impartial? |
| MALONE: | That's correct. |
| DEFENSE COUNSEL: | And his overall willingness to [divulge] the full benefits of his investigation. Now, isn't it true that experts in this field believe the hairs from the same source can differ just as much as hairs between themselves as hairs from a different source? |
| MALONE: | Well, our lab does not feel that, no. |
| DEFENSE COUNSEL: | You don't feel that if we went over here from a |

|  | juror and pulled out quote to use your term numerous hairs that among those there would be such differentiating between the hairs that you couldn't possibly tell in some cases that they came from the same head? |
|---|---|
| MALONE: | Oh no.  No, I could differentiate the jury. |
|  | ... |
| MALONE: | Well, to clear this point up, I'll give you an example.  When I was training to be a hair examiner I was given fifty sets of hairs.  Fifty hairs from fifty different individuals.  I was also given fifty hairs from the same individual, but they were all mixed up. And the only way I was qualified as an expert at the FBI lab is if I could go through and match all fifty of the mixed up hairs to the fifty hairs I had which I did without any mistakes.  Matched fifty mixed hairs to fifty known hairs. |
| DEFENSE COUNSEL: | All right.  I gather then from your expertise that you've recited that you have had considerable more results than these other people who have written these books and periodicals and so on? |
| MALONE: | I can only testify to my own experience in hairs. |
| DEFENSE COUNSEL: | But, even in your own report you say it can't be used as a basis of positive identification, don't you?  You will concede that much? |
| MALONE: | We put it in our report. |

(Tr. 1503-1510)

The examination continues:

| MALONE: | Well, basically without a known source the only thing I'm going to determine is the race, the color, and a few gross characteristics of the hair. |
|---|---|
| DEFENSE COUNSEL: | And that's what you came here to tell us today, |

17

| | too, wasn't it?  Is a few gross characteristics? |
|---|---|
| MALONE: | Not of the hair that I matched to Mr. Pitts. |
| DEFENSE COUNSEL: | Sir, you didn't - - You used the term matched.  I don't believe anywhere in your report you say matched.  You say you can not isn't what you say here?  Let's look again.  I want you to be fair with this defendant.    Hair comparison do not constitute.  Isn't that what you say? |
| MALONE: | Well, there's another paragraph in that report. |
| DEFENSE COUNSEL: | Well, I see several.  I tell you what I see, a bunch of paragraphs.  We're just going to get into that since you brought it up. |
| | . . . |
| DEFENSE COUNSEL: | You found a bunch of white persons hairs and you don't know who they are and you found one black persons hair.  One.  A single black persons hair.  That you admit cannot be used as a basis, positive basis of personal identification. |

(Tr. 1513)

| DEFENSE COUNSEL: | Mr. Malone, I want you to look at that report and see if there is just one black hair or more than one.  I believe you're in error on that. |
|---|---|
| MALONE: | The report says one dark brown hair fragment of negroid origin was found on Specimen Q13, the pants.    This hair fragment microscopically matches the head hair of Pitts and could have originated from Pitts. |
| DEFENSE COUNSEL: | Read on down. |
| MALONE: | Well, it is pointed out that hair comparisons do not constitute a basis for positive - - |
| DEFENSE COUNSEL: | (Interposing) Well, we've been through all this.  That's not the part I'm looking for.  Let me find it.  All right.  Page 4, paragraph 1, 2, 3, 4, 5, Paragraph 5. |

| | |
|---|---|
| MALONE: | Okay. One dark brown head hair of negroid origin was found in specimen Q22 the vacuum sweepings. This hair is dissimilar to the head hairs of Pitts and could not be associated with Pitts. |
| DEFENSE COUNSEL: | So, there was a further - - |
| MALONE: | (Interposing) Yes, there was one hair on the pants and one negroid hair - - |
| DEFENSE COUNSEL: | (Interposing) That's what I was getting at. So, you had two. Now, what other test did you run other than the - - You say you ran the fiber test . . . So, none of these did you find any evidence that Pitts or his clothing had come in contact with Doctor Jones' clothing? |
| MALONE: | In other words, I detected no transfer of fibers. That's correct. |
| DEFENSE COUNSEL: | Now, that's not to say there wasn't a trans- - And you detected no transfer of fibers from Doctor Jones clothing to Pitts clothing? |
| MALONE: | That's correct. |
| | . . . |
| DEFENSE COUNSEL: | All right. But, as far as this man is concerned your fiber test eliminated him or you found no evidence that he ever touched Doctor Jones or vice versa? |
| MALONE: | In other words, my fiber test was negative. |
| DEFENSE COUNSEL: | And, you don't have any idea who all those numerous caucasian hairs belonged to? |
| MALONE: | That's correct. |

(Tr. 1528, 1530-1531)

Following trial, the jury convicted Pitts, and Pitts appealed. The Arkansas Supreme

Court affirmed Petitioner's conviction on direct appeal in 1981. There, Pitts challenged the

sufficiency of the evidence, the exclusion of medical-examiner testimony regarding semen found near the victim's anus, and the admission of testimony regarding the bullet etched with Dr. Jones's name on it. *See Pitts I*. The Court determined no claim had merit.

In affirming the conviction, the Arkansas Supreme Court noted the following with regard to Agent Malone's trial testimony:

> Dr. Jones's clothing was sent to the FBI laboratory for examination. An expert witness, Mike Malone, testified that he found several Caucasian hairs and a brown Negroid hair on the clothing. The Negroid hair, when examined with a microscope, had 20 different characteristics. Sample specimens of Pitts's hair had exactly the same 20 characteristics. Malone testified that as part of a test to qualify as an FBI examiner he was given 50 hairs from 50 different persons. He was also given another 50 hairs from the same persons, but they were all mixed up. He passed the test by matching all 50 pairs correctly, with no mistakes. He said that in his nine years' experience the only way he had seen hairs match the way they did in this instance was when in fact they came from the same person. He testified that his identification was not absolutely positive, like a fingerprint. The jury, however, could certainly have relied upon it in returning a verdict of guilty.

*Pitts I*, 273 Ark. at 224-25, 617 S.W.2d at 851–52. One Arkansas Supreme Court Justice dissented and would have reversed Pitts's conviction for insufficient evidence. Based on the testimony of several disinterested witnesses, Justice Purtle did not find the testimony of Benita Jones to constitute substantial evidence. Nor did he find the lone hair that supported the conviction to be strong enough to bear the weight of a life sentence without parole. *Id*. at 228-231, 617 S.W.2d at 854-855 (Justice Purtle, dissenting).

## C.    The Task Force Reviews Malone's testimony at the Pitts Trial

After reviewing Pitts's case, the task force determined that Pitts's trial had been

tainted by Malone's testimony.  In 2014, the DOJ advised the prosecuting attorney for the Sixth Judicial District that "we have determined that a report or testimony regarding the microscopic hair comparison analysis containing erroneous statements was used in this case....We ask that you determine the actions of your office should take in light of this error." Pitts received a copy of this letter from the DOJ in a letter dated April 2, 2015. The DOJ and the FBI review concluded that there were three types of errors in Malone's testimony:

> (1) [T]he examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others—this type of testimony exceeded the limits of the science;
>
> (2) the examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association—this type of testimony exceeded the limits of the science; or
>
> (3) the examiner cites the number of cases or hair analyses worked in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual—this type of testimony exceeded the limits of the science.

The prosecutor from the Sixth Judicial District conceded that Malone's work was material to Pitts's conviction.  *See Pitts v. State*, 2016 Ark. 345, 3–4, 501 S.W.3d 803, 805 (2016).

### D.    Pitts seeks further review, including the instant federal habeas petition

Thereafter, Petitioner sought state and federal collateral review relief.  Some of the most relevant proceedings are discussed herein.  In *Pitts v. State*, 2011 Ark. 322, the trial court ordered the Arkansas State Crime Lab (ASCL) to conduct DNA testing on certain hairs from the Land Cruiser.  Those hair fragments were sent to ASCL, with those suitable for

nuclear DNA testing, isolated and relabeled. ASCL was unable to obtain a DNA profile on one relabeled fragment, Q13A. The other fragment Q13B was sent to the FBI, which found only Caucasian hairs not suitable for testing on the sample. *Id.* at 2. The first sample Q13A was subsequently lost, as ASCL claims it returned it to the Office of the Clerk of the Arkansas Supreme Court, which has no record of its return. These results did not exonerate Petitioner. On November 4, 2015, Petitioner filed the instant Petition for Writ of Habeas Corpus Based on Newly Discovered Evidence (Doc. No. 1) and an accompanying Motion To Stay (Doc. No. 3), raising claims based on the DOJ's partial recantation of FBI Agent Michael Malone's expert testimony at trial regarding hair analysis, thereby undermining the evidence supporting his conviction. Petitioner acknowledged he had already filed several federal habeas petitions but argued this petition was not successive based on this newly-discovered evidence.[4] The undersigned recommended the Petition be dismissed as a second or successive petition filed without authorization from the Court of Appeals (Doc. No. 4). The undersigned also noted the district judge could transfer the petition to the Eighth Circuit Court of Appeals where the action could have been brought, averring however that the

---

[4]The district court denied Pitt's first petition for relief. On appeal to the Eighth Circuit, the Court affirmed all issues except the death-qualified jury issue, on which it reversed. *See Pitts v. Lockhart*, 753 F.2d 689 (8th Cir. 1985), *vacated*, 476 U.S. 1111 (1986). That reversal was later vacated as a consequence of the United States Supreme Court's ruling in *Lockhart v. McCree*, 476 U.S. 162 (1986). All claims raised in Pitts's second petition were denied by the district court, and the denial was affirmed on appeal. *Pitts v. Lockhart*, 911 F.2d 109, 112 (8th Cir. 1990), *cert. denied*, 501 U.S. 1253 (1991). The Eighth Circuit affirmed the district court in the third petition, finding Pitts failed to make a showing of actual innocence necessary to overcome the procedural bar to have his ineffective-assistance-of-counsel claim considered on the merits. *See Pitts v. Norris*, 85 F.3d 348 (8th Cir. 1996), *cert. denied*, 519 U.S. 1253 (1991).

Eighth Circuit had not decided whether transfer of a successive petition under 28 U.S.C.

§ 1631 was appropriate, mandatory, or even discretionary.  Following objections, the district

court adopted the recommended disposition as modified and transferred the case to the

Eighth Circuit Court of Appeals (Doc. No. 7).  On June 9, 2016, the Eighth Circuit Court of

Appeals granted Pitts's motion for authorization to file a second or successive habeas

application.  In the Corrected Judgment, the Court stated:

> Whether Pitts can satisfy the standards of § 2244(b)(2)(B)(i) and (ii) is a fact-intensive question that requires a thorough examination of information about the FBI expert that might have been available previously to Pitts and a thorough review of the trial record and an assessment of the remaining evidence in support of conviction.  Without reaching a decision on whether Pitts ultimately satisfies the requirements of § 2444(b), we conclude that there is a prima facie showing—i.e., a "sufficient showing of possible merit to warrant a fuller exploration by the district court."  *Johnson v. United States*, 720 F.3d 720, 720 (8th Cir. 2013) (per curiam) (quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)).

> We therefore grant Pitts's motion for authorization to file a second or successive habeas application.  The district court should consider whether Pitts has shown that his claim or claims satisfy the requirements of § 2244(b).  If the court finds that the applicant has not satisfied the requirements with respect to any claim, then it must dismiss the claim without reaching the merits.  28 U.S.C. § 2244(b)(4); *Johnson*, 720 F.3d at 721.  We leave to the district court in the first instance whether it is appropriate to stay proceedings in this case and hold them in abeyance pending resolution of related proceedings in the Arkansas state courts.  *See Rhines v. Weber*, 544 U.S. 269, 275-76 (2005).

(Doc. No. 14, p. 2)

On October 13, 2016, the undersigned ordered the Clerk to serve the Petition on

Respondent.  In the interim, counsel for Petitioner filed a Status Report, noting the Arkansas

Supreme Court had reinvested jurisdiction in the trial court, granting Pitts permission to seek relief via a writ of error coram nobis (Doc. No. 22). *See Pitts v. State*, 2016 Ark. 345, 501 S.W.3d 803 (2016) (Pitts II).[5]  As a result, counsel asked the court to stay the federal habeas petition to allow the state court proceedings to run their course.  At the time of the filing, no state trial court hearing was set.  Respondent filed a Motion to Dismiss and Brief in Support (Doc. Nos. 26 and 27).  In the Brief in Support of dismissal, Respondent argued Petitioner had not demonstrated (1) he diligently brought his claims within one year of the date on which the factual predicate for his claims became discoverable and (2) he could not have brought the claims before in previous habeas applications (Doc. No. 27).   These prerequisites, Respondent averred, are separate and apart from the requirement Petitioner demonstrate the facts underlying his claims, if proven, would be sufficient by clear and convincing evidence to demonstrate no reasonable fact finder would have found him guilty. Respondent also noted the motion for stay should be denied.

Petitioner, through counsel, filed a Response to the Motion on February 2, 2017 (Doc. No. 36).  Petitioner pointed out, by quoting the Eighth Circuit opinion, that Respondent likewise opposed the motion to file a successive petition and argued, as he did here, the factual predicate for the claim could have been discovered earlier and Petitioner could not

---

[5]As noted, the Arkansas Supreme Court reinvested jurisdiction in the trial court, which granted Pitts an evidentiary hearing on his coram nobis petition.  Pitts's counsel was relieved prior to that evidentiary hearing, and he called no witnesses on his behalf.  Instead, Pitts argued he should prevail under the law-of-the-case doctrine.  Following the hearing, the trial court denied relief, and Pitts appealed.  *See Pitts v. State*, 2020 Ark. 7, 591 S.W.3d 786 (Pitts III).

show clear and convincing evidence that no reasonable jury would have convicted him even without the FBI expert's discredited testimony.

Petitioner's counsel and Pitts sought counsel's withdrawal, and the court allowed counsel to withdraw, permitted Petitioner to proceed *pro se* and respond to the pending motion by Respondent (Doc. Nos. 52, 53, 54, 55). Petitioner submitted his *pro se* Response on September 1, 2017 (Doc. No. 56). Following Petitioner's objections and response thereto, the undersigned denied the Motion to Dismiss and granted a stay (Doc. No. 38). Respondent sought review of the undersigned's Order (Doc. No. 45). The district court treated the Order as a recommended disposition, and adopted it as supplemented, concluding the court did not clearly err or misapply the law in granting the stay (Doc. No. 58). On February 23, 2018, the district court administratively terminated the case, effective September 21, 2017 (Doc. No. 61).

On January 9, 2020, the Arkansas Supreme Court affirmed the denial of Petitioner's petition for writ of error coram nobis. *See Pitts III*. The arguments on appeal were that the trial court failed to conduct a proper analysis when it did not treat the admission of certain evidence as structural error and failed to apply the law-of-the-case doctrine.

The Court noted in its opinion that appointed counsel had filed the petition alleging a *Brady v. Maryland*, 373 U.S. 83 (1963), violation, arguing "without Malone's testimony, there was a reasonable probability that Pitts would have been acquitted on the basis of the strengthened proposition of an alternative, white suspect." *Id.* at 2, 591 S.W.3d at 789. The

Court found that "[i]n the hearing on the petition, Pitts, representing himself, presented no evidence, instead asserting what he contended was the correct method of analysis"—that is, that the law-of-the-case doctrine mandated relief—"and the applicable standard to be applied"—that is that the error asserted was structural error. *Id.* The Arkansas Supreme Court concluded the trial court properly conducted the necessary inquiry to determine whether a *Brady* violation had occurred:

> The trial court correctly examined the impact of the repudiated evidence and whether, considering the evidence introduced at trial other than what was later repudiated, there was a reasonable probability of a different outcome—that is, an acquittal. This inquiry produces the same result as the inquires articulated in *Strawhacker* [*v. State*, 2016 Ark. 348, 500 S.W.3d 716] because the question is essentially whether the trial as fundamentally fair.

*Id.* at 7, 591 S.W.3d at 792. The Court found Pitts failed to demonstrate structural error such that even the admission of Malone's testimony undermined the confidence in the fundamental fairness of the outcome. *Id.* at 7-9, 591 S.W.3d at 792. The Court further rejected Pitts's assertion that the Arkansas Supreme Court's sufficiency-of-the-evidence analysis on direct appeal was controlling, finding the issues were not the same as on direct appeal. *Id.* at 10, 591 S.W.3d at 793. The Court then addressed the impact of Malone's testimony, stating in part as follows:

> Pitts also characterizes Malone's testimony as the sole corroborating evidence for identification of Pitts as the kidnapper by Benita Jones, the victim's widow. The trial court, however, noted other evidence that supported Pitts's identification. Instead of the physical evidence from the crime scene, the lynchpin for the State's case against Pitts and the evidence that most strongly supported Benita's identification of Pitts as the kidnapper—and, indeed, her

entire story of the events of that night—was the evidence of Pitts's obsession with Benita and Pitts's fixation with the idea of eliminating Dr. Jones as an impediment to Benita "belonging" to Pitts.

The trial court referred to this evidence, including a receipt found in Pitts's home that was for roses sent to Benita on Valentine's Day and testimony from a handwriting expert about the high probability that Pitts had addressed a package that contained a bullet with Dr. Jones's name etched on it that was sent to Dr. Jones at the same time. Malone's testimony had no impact on the facts surrounding Pitts's obsessive stalking of Benita, which was key to motive and the jury's satisfaction that Benita was credible.

During the trial, the defense challenged the physical evidence linking Pitts to the crime scene, including both hair and soil samples, and introduced evidence intended to show that Benita was not happy in her marriage. The defense highlighted numerous discrepancies in Benita's testimony, focusing on aspects of her story as either physically impossible or highly unlikely to have occurred (she testified that she managed to leave her home still bound hand and foot, cross her backyard and a neighbor's, and negotiate opening—with her face—both a sliding patio door and a gate in the fence between the yards), and yet the jury found her testimony credible. Pitts argues that the jury only found Benita's testimony credible because Malone linked Pitts to the murder scene. On the contrary, it seems that Benita's testimony was so compelling that it not only resolved concerns about the physical evidence, it also overcame reservations about her escape story and addressed questions that the defense raised about the state of her relationship with her husband. There was no clear error in the trial court's finding that the repudiated evidence was not material, and Pitts has not shown an abuse of discretion in the denial of the writ.

*Id.* at 10–12, 591 S.W.3d at 793-794. Three Arkansas Supreme Court Justices dissented to this majority opinion and would have found Malone's expert testimony materially relevant under *Brady* and reversed and remanded for entry of an order granting Pitts a new trial. *Id.* at 12-13, 591 S.W.3d at 794-795. These three dissenters would have also granted Pitts's motion for reconsideration.

**E.**    **Pitts files an Amended Petition for Writ of Habeas Corpus**

On March 16, 2020, Pitts filed a Motion to Reopen his Case, along with an Amended Petition for Writ of Habeas Corpus, seeking relief based on the Department of Justice's repudiation of the evidence provided by Agent Malone at his trial.  The undersigned granted the motion to reopen, and directed Respondent be served the Amended Petition.  On April 16, 2020, Respondent filed a Motion to Dismiss (Doc. No. 64) and Brief in Support (Doc. No. 65), asserting Petitioner's Amended Petition does not satisfy the threshold requirements of 28 U.S.C. § 2244 and should be dismissed with prejudice.  Petitioner filed a Response thereto averring he has met the requirements of § 2244 and arguing the Court should address his claims on the merits and grant him habeas relief (Doc. No. 67).

## II.  DISCUSSION

"To file a second or successive application in a district court, a prisoner must first obtain leave from the court of appeals based on a 'prima facie showing' that his petition satisfies the statute's gatekeeping requirements."  *Banister v. Davis*, 140 S.Ct. 1698, 1704 (2020) (citing 28 U.S.C. § 2244(b)(3)(C).  "Under section 2244(b), the first step of analysis is to determine whether a 'claim presented in a second or successive habeas corpus application" was also "presented in a prior application.'"  *Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005).  If so, the claim must be dismissed; if not, the analysis proceeds to whether the claim satisfies one of two narrow exceptions."  *Id.*; *see also* 28 U.S.C. § 2244(b)(1).  Those two exceptions include (1) the applicant showing the claim relies on a new rule of

constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable or (2) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence and the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.  *See* 28 U.S.C. § 2244(b)(2)(A)-(B).

In granting authorization to proceed with a second or successive petition, the Eighth Circuit Court of Appeals has emphasized that its grant of leave to proceed is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court[.]" *Johnson v. United States*, 720 F.3d 720 (8th Cir. 2013) (citations omitted).  The Court noted the district court must not defer to its preliminary determination as its grant of leave is "tentative in the following sense: the district court must dismiss the motion that we have allowed the application to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for filing such a motion[.]" *Id.* at 721.

It is Respondent's position that Petitioner does not meet the threshold requirements necessary to adjudicate his second or successive filing, namely compliance with both section 2244(d)(1)(D), establishing the one-year limitation period from the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence, and section 2244(b)(2)(B)(i), requiring the claim or claims could not have

been brought in previous habeas applications. (Doc. No. 65, pp. 22-24) Separate and apart from these requirements, Respondent further advances the argument that Petitioner fails to meet the necessary requirement of § 2244(b)(2)(B)(ii), providing that the facts underlying the claims, if proven, would be sufficient by clear and convincing evidence to demonstrate no reasonable factfinder would have found Petitioner guilty of the underlying offense.

## A.    <u>Due Diligence and Timeliness</u>

Under the Antiterrorism and Effective Death Penalty Act (AEDPA) habeas petitioners have one year from the latest of four triggering events to file a petition for habeas relief in federal court. 28 U.S.C. § 2244(b)(1). Both parties rest their initial inquiry of timeliness under section 2244(d)(1)(D), which starts the limitations period as of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." "The factual predicate of a petitioner's claims constitutes the vital facts underlying those claims." *Earl v. Fabian*, 556 F.3d 717, 725 (8th Cir. 2009) (quoting *McAleese v. Brennan*, 483 F.3d 206, 2014 (3d Cir. 2007)). The one year permitted under this subsection runs "from when the relevant facts could have been discovered through diligent inquiry, not from when they were actually discovered or their significance realized." *Hudson v. Dormire*, 2007 WL 1192170, at 4 (E.D. Mo. 2007) (citing *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2001)). "The Petitioner has the burden of persuading the court that he has exercised due diligence in his search for the factual predicate of his claim." *Lott v. Coyle,* 261 F.3d 594, 605-606 (6th Cir. 2001); *see also Frazier v. Rogerson*, 248 F. Supp. 825, 832

(N.D. Iowa  2003).

Respondent argues Petitioner has not shown due diligence because he knew the factual predicate either (1) at trial or (2) at least fifteen (15) years before filing this successive petition.  (Doc. No. 65, pp. 24-33) To support its position, Respondent points to Petitioner's submission that he was first notified by the DOJ about an issue with Agent Malone's testimony in late November or early December 2014 and that he received the completed report in April 2015.  (*Id.* at 25)  Respondent submits this timeline only indicates Petitioner's passive receipt of information but proclaims more was required of Petitioner to demonstrate whether or why the factual predicate of his claims could not have been discovered sooner. (*Id.*)  The factual predicate of Petitioner's due process claim per Respondent is not the DOJ report but instead Agent Malone's testimony that overstated what the science of hair microscopy would support.  (Doc. No. 65, p. 25) Thus, Respondent states the inquiry as "whether the allegation that Malone overstated the strength of the hair's link to Pitts could have been discovered previously with the exercise of due diligence."  (*Id.* at 26) In support of its conclusion that it was previously discovered, Respondent points to Petitioner's pleading in the trial court, prior to 2015, where he averred he was aware of problems with Malone's bona fides but did not seek relief, perceiving any challenge as one to credibility. (*Id.* at 27 (citing *Pitts v. State*, 2016 345, 5-6, 501 S.W.3d at 806-807) (Goodson, J., concurring in part and dissenting in part) (noting that "it appears that the limits of this analysis may have been known at the time of the trial and long before the Department of

31

Justice issued its most recent report[,]" citing the trial record itself, and observing that "questions regarding Malone's expert testimony in this and other cases have been percolating since the late 1990s with the issuance of the 1997 OIG report [ ]")).

Respondent claims Petitioner knew the factual predicate at trial based on the challenges to Agent Malone's testimony by defense counsel and Malone's testimony that (1) hair comparisons could not be used as a basis for personal identification unlike fingerprints and (2) Malone could not say the hair from the victim's pants came from Petitioner to the exclusion of everyone else. (*Id.* at 28) This testimony, Respondent proclaims, sufficiently cured or recanted the impression in Malone's testimony that he had matched the hair to Pitts, and thus, the inaccuracies of Malone's testimony was knowable—and known—at the time of trial. (*Id.*) Alternatively, Respondent asserts Petitioner's litigation history demonstrates that, by 2001 or 2002, he had actual knowledge of the DOJ's criticisms of Malone's testimony in other matters and sought DNA testing to prove a claim of actual innocence. In support, Respondent points to Petitioner's actions filed in state court in 2001 and 2002 in which Petitioner referred to, and in at least one instance attached portions of, the 1997 DOJ Task Force report.

As best understood by the Court, Petitioner's position is that the government's April 2015 admission that Malone provided false and fraudulent testimony was itself sufficient factual support: "[t]he knowledge of this claim and factual basis to support it was provided on April 2, 2015, when Petitioner received the results of the independent scientific review

conducted by the DOJ, FBI, and other entities."  (Doc. No. 67, p. 5)  Petitioner states he

subsequently filed a petition in the Arkansas Supreme Court some sixty (60) days later, citing

Justice Danielson's partial concurrence and dissent in *Stawhacker*, *supra*, noting the

foundation for claims of both Strawhacker and Pitts was the release of the report indicating

some fallacies committed at both trials.  (*Id.* at pp. 5-6)

Here, there is no evidence from which the undersigned can conclude Petitioner learned

or could have learned the factual predicate for his claim before the DOJ revealed the errors

in Agent Malone's testimony in Petitioner's trial.  In *Jimerson v. Payne*, 957 F.3d 916, 927

(8th Cir. 2020), the Eighth Circuit determined due diligence did not require "defense counsel

to possess psychic abilities and discover potentially favorable evidence during trial that the

State chose to conceal, particularly when defense counsel specifically requested disclosure

of the evidence" at issue.  Similarly, the Court cannot impose such a feat on Petitioner here.

To equate challenges to the results and interpretation of scientific evidence presented

by the State's expert witness on cross-examination to knowledge that the witness would give

testimony that would later be repudiated is misguided and disingenuous at best.  While

Petitioner may have known there had been challenges to Malone's testimony outlined in

other cases, he was not aware Malone's testimony was misleading and beyond the limits of

forensic hair analysis available at the time until he received the letter particular to his case.

According to the 2014 OIG report, it took the FBI more than six (6) years to retain

independent scientists with the appropriate educational and professional qualifications and

ability to obtain security clearances necessary to conduct the required case reviews. What resources could an indigent inmate in prison since the late 1970s have to pursue a challenge based on his mere inclination that the scientific evidence used at his trial and interpreted by an expert witness was erroneous in his trial? Had he filed a petition when the results of the 1997 report were released—which linked Malone at that time to only one known case of false testimony—or by as early as 2001 when he knew of the criticisms to Malone's testimony in other matters—the challenge would have remained speculative.

The Eighth Circuit determined in *Jimerson* that due diligence does not obligate a defendant to monitor a co-defendant's court filings for information that could give rise to post-conviction relief." *Jimerson*, 957 F.3d at 927. If such a burden is not placed on co-defendants, surely it cannot be placed on Petitioner to randomly scout out any and all cases Malone testified in to come up with the factual predicate for his own case. "While evidence is 'new' if it was not available at the time of trial through the exercise of due diligence, due diligence does not require a defendant to root out information that the State has kept hidden. The State cannot play 'hide and seek' with information it was required to disclose and then accuse defense counsel of lacking due diligence." *Id.* (internal citations omitted). Similarly, we cannot expect Petitioner to root out false or misleading testimony when the State itself was unaware of these misgivings with its own expert witness. Defense counsel cross examined Agent Malone about what the forensic hair test results meant; clearly, neither the State nor defense counsel knew Agent Malone's testimony regarding what those test results

meant went beyond the then-available scientific limits of forensic hair analysis.  Thus, although Agent Malone's trial testimony regarding the hair found at the scene and its relation to Pitts was misleading, the State's argument that Pitts knew the relevant factual predicate at trial and knew at that time the scientific limits of hair microscopy must fail.  That Petitioner did not actually make this discovery or realize its significance is inapposite.  *See Owens v. Boyd,* 235 F.3d 356, 359 (7th Cir. 2001) ("Time begins when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance.").

Based on the foregoing, the undersigned finds Petitioner brought his claim within one year of the date on which the factual predicate of the claim could have been discovered through the exercise of due diligence.  Nonetheless, the petition must fail because Petitioner cannot satisfy the actual-innocence standard of 28 U.S.C. § 2244(b)(2)(B)(ii).

## B.   <u>Actual Innocence</u>

To enable presentation of a claim alleging a constitutional violation, a sate prisoner seeking relief in a successive federal habeas proceeding must show not only that the factual predicate for the claim could not have been discovered previously through the exercise of due diligence but also that the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.  28 U.S.C. § 2244(b)(2)(B).  This standard has been described as a "strict form of innocence . . . roughly equivalent to the Supreme Court's definition of innocence or manifest miscarriage of justice in *Sawyer v. Whitley*, 505 U.S. 333 (1992)."

*Case v. Hatch*, 731 F.3d 1015, 1031-32 (10th Cir. 2013).

> The phrase 'evidence as a whole,' as used in § 2244(b)(2)(B)(ii), refers to the entirety of the trial evidence as well as new evidence offered in the collateral proceedings. Regarding evidence offered in the collateral proceedings, the petitioner must 'come forward not only with new reliable evidence which was not presented at trial, but . . . come forward with new reliable evidence which was not available at trial through the exercise of due diligence.' *Kidd v. Norman*, 651 F.3d 947, 953 (8th Cir 2011).
>
> When assessing the likely impact of this overall body of evidence upon reasonable jurors, the court itself does not view the evidence through a personal and subjective lens. Rather, the court must conduct an objective analysis of how hypothetical, rational jurors likely would view the evidence. *See Schlup v. Delo*, 513 U.S. 298, 329 (1995) ("It is not the district court's independent judgment as to whether reasonable doubt exists that the standard address; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do.").

*Nooner v. Hobbs*, 689 F.3d 921, 933 (8th Cir. 2012).

Pitts cannot demonstrate by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty of murdering Dr. Jones. Pitts's argument is based in part on the majority opinion in Pitts II, which stated even the prosecutor conceded to the DOJ that Malone's testimony was material to Pitt's conviction, and on the dissent in Pitts III, where three justices failed to comprehend how the circuit court and its current court could conclude Malone's testimony was immaterial. Malone's testimony was not the only evidence available, however.

Because the question is one of actual as opposed to legal innocence, the court must assess "all the available evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Schlup v.Delo*, 513 U.S. at 328. Merely because a

witness errs or is mistaken in his testimony of course does not mean that the witness has given false or perjured testimony. *See United States v. Bailey*, 123 F.3d 1381, 1395-1396 (11th Cir. 1997). Nor does the Court impute the knowledge of improper testimony from state expert witnesses to the State. *See Mathison v. United States*, 2011 WL 2635863 (N.D. Iowa July 5, 2011); *Smith v. Massey*, 235 F.3d 1259 (10th Cir. 2000); *United States v. Michael*, 17 F.3d 1383, 1985 (11th Cir. 1994). Malone's misleading testimony does not prove Pitt's innocence. There was other evidence that would allow a reasonable juror to convict Pitts, most notably, Mrs. Jones's identification of Pitts as the man inside her home and who left with her husband.

Mrs. Jones testified the intruder wore nothing over his eyes and some sort of mask that concealed his nose and mouth. She recognized the intruder's voice and asked, "It's you, isn't it, Gene?" The man told her "Don't call me no more Goddamn names and just shut up an lie down." The man continued to talk, and before tying her up, said to Dr. Jones, "You lied, didn't you, Doc? You told me she had a class." Mrs. Jones interjected, "No, no, he didn't lie. I had a class but I had to come home and get something," to which the man responded to Dr. Jones, "Doc, you're going to have to pay for that. You lied." *Pitts I,* 273 at 223, 617 at 851. Once questioned following the murder, a search of Pitts's home revealed a paid receipt from a flower shop for a dozen roses to be delivered to Benita Terry at Legal Aid on Valentine's Day 1978. A handwriting expert also testified it was highly probable Pitts wrote the address on the package containing the bullet with "Bernard" etched on it that Dr. Jones received on that same day.

There was some time discrepancy argued by Petitioner. Mrs. Jones's testimony at trial put Dr. Jones and the home intruder's departure from the Jones home between 6:15 and 6:20 p.m. on the evening of the murder. A disinterested neighbor, Linda Stanley, testified she returned to her

home at 6:07 p.m. that day[6], and as she turned into her driveway, her headlights shone on a Land Cruiser about a car length away, parked in front of the house next door.  Stanley testified she saw two men standing by the vehicle who made an effort to duck away and conceal themselves.  She had the impression the men were white, but she did not see their faces and was uncertain.  She thought they may have been white because the neighborhood was all white.  Mrs. Stanley left her home again to purchase milk from Skaggs with a friend, and the cash register receipt fixed her time at the store as 6:35 p.m.  *See Pitts I.*

Another disinterested witness, Mark Musgrave, then aged 15, testified he lived across the street from Mrs. Stanley.  Musgrave noted at 6:30 p.m. he was standing at the window in his home, looking for a friend who was picking him up between 6:30-7:00 p.m.  He liked cars, especially Land Cruisers, so when he saw a Land Cruiser drive up and park at approximately 6:30 p.m.  Musgrave called his mother over from the kitchen to see the Land Cruiser, telling her it was the kind of car he wanted.  Musgrave noted that either one or two men got out and ran past Mrs. Stanley's house toward the field behind it. He thought the men were white, but it was dark and raining so he was not sure.  Musgrave stated Mrs. Stanley pulled up about five or ten seconds after the Land Cruiser parked.  He did see Mrs. Stanley's friend pull into her driveway right after her and go into the house. He then left his home and did not see the two of them leave back out.

Mark Musgrave's mother also testified about her son calling her over to see the Land Cruiser.  She said the Mary Tyler Moore show came on at 6:30 p.m. while she and Mark were

---

[6]It is noted in *Pitts I* that Mrs. Stanley had not mentioned the time of 6:07 p.m. in her written statements, but at the suggestion of the police and at the request of the defense, she submitted to hypnosis.  A deputy prosecutor was present during the hypnosis, and while under, Stanley remembered the time as 6:07 p.m.  The opinion also notes there is no testimony about the reliability of a hypnotically-induced stimulated memory.

discussing the Land Cruiser.

This disinterested witness testimony, taken along with Mrs. Jones's testimony and that of the handwriting expert and Agent Malone does certainly present some inconsistences; however, the jury was free to decide whether to believe or find any testimony or evidence credible or persuasive. Because Pitts has offered no additional evidence of his innocence, and considering all the evidence—including Pitts's calls to Mrs. Jones, jealousy of Mr. Jones, harassment and threats to the Joneses, corroborated by the evidence found in Pitts's home after the murder and the handwriting expert's testimony that Pitts likely wrote the address on the package delivered to Dr. Jones that contained the bullet delivered to Dr. Jones on Valentine's Day—the undersigned cannot find by clear and convincing evidence that, but for these constitutional errors, no reasonable juror would have found him guilty when, in fact, a jury assessed the existing evidence and found him guilty. *Jones v. Jerrison,* 20 F.3d 849, 856–57 (8th Cir. 1994).

Even if it were determined Malone's testimony was so unreliable to have infected the trial, the petition would still fail. The jury weighs witness credibility and the weight of presented evidence to determine whether reasonable doubt existed as to Pitts's guilt. *United States v. Cole*, 449 F.2d 194, 197 (8th Cir. 1971), *cert. denied*, 405 U.S. 931(1972). The Court does not conclude that no reasonable juror could have found Pitts guilty. In other words, a reasonable juror, considering all the evidence, could still convict Pitts.

### III. Certificate of Appealability

In order to obtain a certificate of appealability on a claim that was denied on procedural grounds, the petitioner must demonstrate both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right,

and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Reasonable jurists could find it debatable whether the Court's procedural ruling is correct and whether Pitts has shown that he was denied a constitutional right, as evidenced by the dissent in Pitts III, as well as the Eighth Circuit's order authorizing Pitts's second or successive federal habeas pursuant to 28 U.S.C. § 2244(b).  *See* Doc. No.  12; *see also Rhodes v. Smith*, Case No.  CV 17-4025 (JNE/BRT), 2018 WL 5555123, at *2 (D. Minn. Oct. 29, 2018), *aff'd,* 950 F.3d 1032 (8th Cir. 2020) (citing *Case v. Hatch*, 731 F.3d at 1026 n.3) (noting that an unpublished order authorizing second habeas petition did not have precedential effect on subsequent § 2244(b)(2)(B) analysis but could be considered for its persuasive value)). The undersigned will therefore recommend the district court issue a certificate of appealability as to its § 2244(b)(2)(B) analysis.

## IV.  Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.     The Motion to Amend/Correct Amended Petition for Writ of Habeas Corpus, Doc. No. 68, be granted.

2.     The Motion to Dismiss Amended Petition for Writ of Habeas Corpus, Doc. No. 64, be granted.

3.     The Amended Petition for Writ of Habeas Corpus, Doc. No. 62, be dismissed.

4.     A Certificate of Appealability be granted.  *See* 28 U.S.C. § 2253(c)(1)-(2);

Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.

     DATED this 4th day of December, 2020.

_____
UNITED STATES MAGISTRATE JUDGE